UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
UNITED STATES OF AMERICA

    - against –

AKEEM CHAMBERS,
    also known as "Luca,"
JERELL SHAW,
    also known as "Rells Fargo"
    and "Rells," and
JONATHAN VAZQUEZ,
    also known as "Chulo"
    and "Clutch."

                Defendants.
------------------------------------------------------------------------X

**ORDER**

23-CR-157 (JMA)

**FILED**
**CLERK**

6/8/2026 12:38 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

For Online Publication Only

**AZRACK, United States District Judge:**

Weeks into trial, Defendants raised, for the first, time, challenges to the Government's firearms examiners, Jonathan Fox and Bryce Ziegler—both of whom the Government had disclosed months before trial. Defendants belatedly requested a Daubert hearing and also sought to exclude or substantially limit the testimony of these examiners concerning their toolmark analysis and their opinions that certain shell casings were fired from specific firearms. The Court denied Defendants' request for a Daubert hearing as to Ziegler, held a Daubert hearing as to Fox, and permitted both examiners to testify and to provide their opinions at trial.

The Court issued a short order on February 18, 2026 concerning Ziegler. As for Fox, the Court orally denied Defendants' motion and indicated that a written decision would be issued. The instant decision explains the Court's rulings on Defendants' Daubert challenges.

## I. BACKGROUND

**A.  Overview of Firearms and Toolmark Identification Analysis**

"[F]irearms identification is a discipline of forensic science in which [an examiner] seeks to determine if a fired ammunition component"—a cartridge casing or bullet—"was or was not fired by a particular firearm." (Tr. 2447, see also Tr. 2454–56, 4975.)  Firearms examiners perform microscopic comparisons of recovered evidence (casings or bullets) against test-fired ammunition from the subject firearm they are considering.  (Tr. 2457–2461, 4980, 4989–4990.)  According to the theory underlying toolmark analysis, when a firearm is produced, the tools used to manufacture the firearm leave unique characteristics within that firearm, and when a cartridge casing or bullet is fired out of the firearm, those individual characteristics will be left on the casing or bullet.  (Tr. 4981.)  Individual characteristics can also be produced during the lifetime of the firearm through rust, abuse, and corrosion.  (Tr. 2457.)

Fox applies the "AFTE"[1] theory of identification, according to which he will conclude that two items were fired from the same firearm when there is "sufficient agreement of individual characteristics" as well as agreement in class characteristics.  (Tr. 4983–86, see also Tr. 4992, 5034.)

Although Ziegler did not testify that he applies the AFTE theory of identification, his testimony indicated that he also uses "sufficient agreement" as the standard to make identifications. (Tr. 2460.)  According to Ziegler, he will make an identification when he finds agreement in class characteristics and "sufficient agreement in individual characteristics"—which Ziegler characterized as a "very high level of agreement." (Tr. 2460.)

Based on their examinations and comparisons, firearm examiners may also reach an inconclusive determination or may eliminate/exclude the firearm at issue.  (Tr. 4992.)

---

[1]  AFTE refers to the Association of Firearm and Toolmark Examiners (the "AFTE").  (Tr. 4976.)

Any identifications made by Ziegler and Fox must be verified by a second qualified firearms examiner. (Tr. 2460–61, 4991, 5018–19.) When a firearms examiner makes an identification, they take micrographs of the specimens to document their findings. (Tr. 5001, 5005.)

## B. **Procedural History**

The Government disclosed these two expert witnesses to the defense well before trial. The defense received the expert notices for Zeigler and Fox in October 2025 and received almost all the underlying documents for Fox in February 2025.

In July 2025, the Court directed the defense to make any pre-trial motions by October 24, 2025, a deadline that was later extended to November 7, 2025.

Defendants never requested a Daubert hearing prior to trial and instead waited until four weeks into the trial to request a Daubert hearing concerning Ziegler and Fox.

On February 2, 2026, the defense filed a motion challenging the sufficiency of the expert disclosure for Fox, which Defendants had received in October 2025. The defense did not challenge the sufficiency of the expert disclosure for Zeigler in this motion. In this February 2 motion, the defense requested, among other things, a continuance to prepare for cross-examination and to evaluate the need for a defense expert. This motion, however, did not mention the prospect of Defendants requesting a Daubert hearing. The parties subsequently addressed this motion orally on multiple occasions. (See Tr. 851–857, 1439–1450.) During these exchanges, the defense said nothing about seeking a Daubert hearing.

On Friday, February 13, the Government then informed Defendants that Ziegler would be testifying the next week. Defendants, however, did not promptly inform that Court that they would be filing a motion seeking a Daubert hearing concerning Ziegler's testimony. Instead, Defendants

3

filed a motion requesting a <u>Daubert</u> hearing for both Ziegler and Fox at 5:35 PM on Monday, February 16.

In light of the procedural history outlined above, on February 18, the Court denied Defendants' request for a <u>Daubert</u> hearing concerning Ziegler as untimely and permitted Ziegler to testify. (ECF No. 446.) The Court did require that Ziegler's testimony conform "to the limitations set out in [<u>United States v. Graham</u>, No. 23-CR-00006, 2024 WL 688256 (W.D. Va. Feb. 20, 2024)], which directed that the expert's testimony conform to the DOJ's Uniform Language for Testimony of Reports for the Forensic Firearms/Toolmarks Discipline ("ULTR")." (ECF No. 446.)

Ziegler—a forensic firearms examiner in the FBI's Firearm and Toolmark Unit since 2015—testified on February 18, 2026. During his direct examination, he explained firearms identification analysis and stressed that an identification made by a firearms examiner is a "subjective opinion" based on the "class and individual features" that the examiner observes. (Tr. 2447.) Ziegler admitted that his discipline has "limitations" and that his opinions about an identification are not "absolute or with a hundred percent certainty." (Tr. 2447.) Ziegler explained that when he states that "something in my opinion is an identification, that does not mean it's absolute or with a hundred percent certainty but it is my subjective opinion"; however, "when we see the level of agreement that reaches this high of a level, I would not expect to see that agreement produced by another firearm." (Tr. 2247.) Ziegler proceeded to opine that he identified a recovered shell casing as being fired by the firearm slide at issue. (Tr. 2471–72.) Defendants

did not cross-examine Ziegler.[2]  (Tr. 2476, 2479.)

While the Court had sufficient grounds to also deny Defendants' untimely request for a Daubert hearing concerning Fox's testimony, the Court, in an abundance of caution, granted Defendants' request for a Daubert hearing concerning Fox as he was scheduled to testify later in the trial.  Defendants informed the Court that the Daubert hearing they sought would take "about an hour."  (Tr. 2200.)

At the Daubert hearing for Fox held on March 11, 2026, both parties questioned Fox, but the defense did not call any additional witnesses at the hearing.[3]  (Tr. 4973.)

At the hearing, the Government introduced nine studies addressing toolmark analysis, including:

- David P. Baldwin et al., *A Study of False-Positive and False-Negative Error Rates in Cartridge Case Comparisons*, 7 (2014) (the "2014 Ames I Study");

- Mark A. Keisler et al., *Isolated Pairs Research Study*, 50 AFTE J. 56, 58 (2018) (the "2018 Keisler Study");

- Jaimie A. Smith, *Beretta Barrell Fired Bullet Validation Study*, 66 J. Forensic Scis. 547 (2020) (the "2020 Smith Study"); and

- Keith L. Monson, et al., *Accuracy of Comparison Decisions by Forensic Firearms Examiners*, 68 J. Forensic Scis. 86, 87 (2022) (the "2022 Ames II Study").[4]

---

[2]  The Court was not required to hold the Daubert hearing for Ziegler requested by Defendants.  First, this request was properly denied as being untimely, a finding that was particularly appropriate given Defendants' decision to request a Daubert hearing weeks into trial and less than two days before Ziegler was scheduled to take the stand.[  Second, a Daubert hearing was also not necessary because, as in United States v. Williams, 506 F.3d 151, 161 (2d Cir. 2007), Ziegler's testimony on direct examination set forth "a sufficient basis," under Daubert, "for allowing the testimony." Id.  Prior to Ziegler's testimony, the Government also submitted two recent studies to the Court that established the reliability of firearms analysis.  (ECF No. 441; see also n.4 infra.)  Furthermore, the Court's analysis below concerning Fox's testimony, which was based on an even fuller record after a Daubert hearing, further supports the Court's conclusion that Ziegler's testimony was sufficiently reliable under Daubert.

[3]  In a number of cases cited by Defendants, courts held lengthy hearings involving defense witnesses, including experts who critiqued toolmark analysis and the studies of this discipline.  See Abruquah v. State, 483 Md. 637, 656 (2023); People v. Ross, 68 Misc. 3d 899, 129 N.Y.S.3d 629 (N.Y. Sup. Ct. 2020); United States v. Otero, 849 F. Supp. 2d 425, 431 (D.N.J. 2012).  No such experts were called in this case.

[4]  The Government had previously submitted the 2020 Smith Study and the 2022 Ames II Study in connection with the Government's response to Defendants' February 16 letter that first raised Daubert challenges to Ziegler and Fox.

After receiving Defendants' post-hearing brief and hearing the Government's response to that brief, the Court orally denied Defendants' Daubert motion.  The Court permitted Fox to testify and informed the parties that a written opinion would eventually be issued.  (Tr. 5519.)  The Government agreed that, like Ziegler, Fox would conform his testimony to the limitations set out in Graham, 2024 WL 688256.  (Id.)

Fox is a forensic firearms examiner with twenty years of experience in firearms examination and analysis.  (Tr. 4975–76.)  He currently works at the Nassau County Medical Examiner's Office and previously worked for the New York City Police Department.  (Tr. 4974–75.)  Fox went through a microscopic training program for "a year and a half" that was guided under the AFTE.  (Tr. 4976.)  He completed competency tests at the end of his training and continues to take annual proficiency tests.  (Tr. 4977.)  During his career, Fox completed "tens of thousands" of "microscopic comparisons" of evidence and has testified as an expert approximately four hundred times in state and federal court.  (Tr. 4977–78.)

Fox testified that when an identification is made by firearms examiners in his field, such an identification "stands for the proposition that there's extremely strong support that the . . . two toolmarks originated from the same source and extremely weak support for the proposition that the two toolmarks originated from a different source." (Tr. 6176; see also Tr. 6182.)  Fox admitted that when he makes an identification based on the sufficient agreement standard, that is his subjective opinion and such opinions are "not a hundred percent scientific certainty." (Tr. 6207; see also Tr. 4986, Tr. 6274 (confirming, on cross examination, that his conclusions are "not 100 percent certainty and are [his] subjective opinion").

Fox stated that when he observes sufficient agreement to make an identification that means that "for another firearm or tool to make those marks would be a practical impossibility." (See,

e.g., Tr. 6208.)  Fox also explained that when he makes an identification he would "not expect to see those marks made by another firearm."  (Tr. 6208.)

Fox analyzed various cartridge casings, bullets, and firearms in connection with this case and testified about identifications he made based on cartridge casings.[5]  (Tr. 6188–94, 6208–6274.)

## II.  DISCUSSION

### A. Rule 702 and the Daubert Standard

Under Federal Rule of Evidence 702:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court enumerated a list of additional factors bearing on reliability that district courts may consider:

> (1) whether a theory or technique has been or can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or

---

[5]  During Fox's testimony to the jury, Defendant Chambers objected that, under the limitations set out in Graham, Fox should not be able to opine that two pieces of ammunition were fired from the same firearm because, according to Chambers, that would be no different than Fox "saying [he was] 100 percent certain they were fired from the same firearm to the exclusion of all others."  (Tr. 6195.)  Defendant Chambers' objection misunderstood the limitations set out in Graham, which do not preclude an examiner from making an identification and, explaining, using permissible language, the meaning of an identification.  In response to this objection, the Court issued a short order clarifying how Fox should proceed with respect to testimony about "identification[s]" he made in accordance with the Graham standard and the testimony that Ziegler had already provided.  (ECF No. 491.)

theory has gained general acceptance in the relevant scientific community.

United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007) (citing Daubert, 509 U.S. at 593–94). The Daubert inquiry is a "flexible one," and there is no "definitive checklist or test" for whether expert testimony is reliable. United States v. Romano, 794 F.3d 317, 330 (2d Cir. 2015) (cleaned up).

**B.  Fox's Testimony is Reliable**

The Government demonstrated that it is more likely than not that the requirements of Rule 702 have been satisfied here.  The methodology for toolmark analysis has been tested and subjected to peer review.  This methodology is also subject to sufficient standards controlling its applications, sufficient studies have calculated a permissible potential error rate, and the methodology is generally accepted in the community of forensic scientists and firearms examiners.

Defendants' Daubert motion challenged Fox's testimony on various grounds and sought to preclude his testimony entirely or to substantially limit Fox's testimony and any opinions he was permitted to give.  (See ECF No. 440, ECF No. 476 at 17–19.)  Defendants requested that Fox be precluded from testifying that he identified any ballistics evidence as being fired from the same firearm and that his opinions should essentially be limited to opinions based on class characteristics.  In the alternative, Defendants requested that Fox be permitted to state only that, in his opinion, the marks he observed on two shell casings are "consistent" with having been fired from the same firearm, without using the term "identified" or any language implying certainty or an absolute conclusion.  Defendants also requested that the Court require Fox to make certain disclosures during his direct testimony or that the Court provide specific limiting instructions to the jury.

Defendants generally assert that the AFTE methodology writ large is not sufficiently reliable under Daubert.  Defendants also point to specific aspects of Fox's testimony, his

8

background, and particular comparisons and determinations he made in this case, contending that these specific alleged deficiencies undermine the reliability of Fox's opinions and  also support Defendants' broader challenges to the AFTE methodology.  According to Defendants, when all these points are considered in the aggregate, the Court should exclude or substantially limit Fox's testimony.

The Court addresses the various arguments raised by Defendants below and has also considered the cumulative force of those points.

Many of the broad challenges Defendants raise concerning toolmark analysis and the AFTE methodology have been addressed by other courts that rejected similar Daubert challenges, including arguments concerning the subjective nature of the "sufficient agreement" standard, the potential error rate for toolmark analysis, and purported deficiencies in the studies that examined toolmark analysis and calculated error rates.  See, e.g., United States v. Johnson, No. 16-cr-CR-281, 2019 WL 1130258, at *1 (S.D.N.Y. Mar. 11, 2019), aff'd, 861 F. App'x 483 (2d Cir. 2021); United States v. Boone, No. 23-CR-427, 2024 WL 2160230, at *9 (S.D.N.Y. May 13, 2024); United States v. Graham, No. 23-CR-00006, 2024 WL 688256, at *14 (W.D. Va. Feb. 20, 2024); United States v. Romero-Lobato, 379 F. Supp. 3d 1111, 1118 (D. Nev. 2019), aff'd, United States v. Romero-Lobato, No. 20-10280, 2022 WL 2387214, at *1 (9th Cir. July 1, 2022) ("Based on the record before it, the [district] court permissibly concluded that the toolmark method is testable, has been subjected to publication and peer review, has a low error rate, and has long been an accepted method in the forensic science community.  Therefore, although the method may involve a degree of subjectivity, the district court was within its discretion to admit this evidence.").

The Court agrees with the persuasive analyses in those cases.  Notably, in Johnson, Judge Gardaphe denied a similar Daubert challenge to expert testimony by Fox and was affirmed on appeal.  Johnson, 2019 WL 1130258.  While a minority of courts have imposed substantial

limitations on testimony from firearms examiners, the Court is not persuaded by the analysis set out in those decisions.  See, e.g., United States v. Shipp, 422 F. Supp. 3d 762, 782 (E.D.N.Y. 2019); Abruquah v. State, 483 Md. 637, 690, 296 A.3d 961, 993 (2023).

Defendants rely on two reports from 2009 and 2016 that were critical of firearms comparison and the studies that had been performed of this discipline: (1) National Research Council of the National Academies, *Strengthening Forensic Science in the United States: A Path Forward* (2009) (the "2009 NRC Report"); and (2) *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods*, prepared by the President's Council of Advisors on Science and Technology (2016) (the "2016 PCAST Report").

Numerous courts have considered the 2009 NRC Report and the 2016 PCAST Report in depth and have, based on studies that were conducted both before and after those reports, rejected similar Daubert challenges.  Again, the Court agrees with the analyses in those cases, including Judge Gardaphe's analysis rejecting the Daubert challenge to Fox's testimony in Johnson, 2019 WL 1130258, at *12.  Judge Gardaphe subsequently reached the same conclusion about similar testimony from a different firearms analyst in Boone, 2024 WL 2160230.  In Boone, Judge Gardaphe also considered two of the more recent studies the Government relies on here—the 2020 Smith Study and the 2022 Ames II Study.  This Court agrees with Boone that those studies further support the "testability" of toolmark analysis and suggest that the error rate for such analysis is under 1%.  Id. at *7, 9; see also Graham, 2024 WL 688256, at *9 (relying on the 2020 Smith Study, the 2022 Ames II Study, and the 2018 Keisler Study in denying Daubert challenge).

The Court addresses Defendants' other arguments below.

## C. **The Amendments to Federal Rule of Evidence 702**

While Defendants stress the recent amendments to Rule 702, this Court has considered those amendments and the accompanying Advisory Committee Notes in its analysis.[6]

Other courts have also found that similar expert testimony was permissible under the amended rule. See United States v. Pulliam, No. 21-CR-00156, 2024 WL 1142004 (D. Conn. Mar. 15, 2024); Graham, 2024 WL 688256, at *14; United States v. Robinson, No. 23-CR-389, 2025 WL 2879543 (M.D. Fla. Oct. 9, 2025). Here, the Government has demonstrated that "it is more likely than not that" the requirements of Rule 702 have been met and the testimony of both Fox and Ziegler comported with the concerns expressed in the Advisory Committee Notes.

## D. **The Known or Potential Error Rate**

Defendants advance various arguments concerning the error rate for toolmark analysis generally as well as arguments concerning Fox's individual "error rate" or lack thereof.

Defendants are correct that a definitive error rate has not been established for the field of toolmark analysis. Johnson and Graham, however, persuasively explain why this is not fatal under Daubert. See Johnson, 2019 WL 1130258, at *18–19; Graham, 2024 WL 688256, at *8–10.

---

[6] The Advisory Committee Notes for the 2023 Amendments to Rule 702(d) state:

> [Rule 702(d) has] been amended to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology. Judicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support.

> The amendment is especially pertinent to the testimony of forensic experts in both criminal and civil cases. Forensic experts should avoid assertions of absolute or one hundred percent certainty—or to a reasonable degree of scientific certainty—if the methodology is subjective and thus potentially subject to error. In deciding whether to admit forensic expert testimony, the judge should (where possible) receive an estimate of the known or potential rate of error of the methodology employed, based (where appropriate) on studies that reflect how often the method produces accurate results. Expert opinion testimony regarding the weight of feature comparison evidence (i.e., evidence that a set of features corresponds between two examined items) must be limited to those inferences that can reasonably be drawn from a reliable application of the principles and methods. This amendment does not, however, bar testimony that comports with substantive law requiring opinions to a particular degree of certainty.

Various studies have calculated potential error rates of around 1% and the Court finds that those error rates are sufficiently low to render toolmark analysis and Fox's testimony reliable.  See Johnson, 2019 WL 1130258, at *18–19; Graham, 2024 WL 688256, at *8–10.

Defendants assert that studies cited by the Government do not correctly calculate the potential error rate because, according to Defendants, those error rates do not properly account for "inconclusive" determinations made by examiners.  The Court disagrees and finds that the relevant error rate for purposes of the Daubert analysis looks at false-positive error rates rather than inconclusive determinations.  See Graham, 2024 WL 688256, at *8–10.

Second, Defendants—citing very low error rates for analysis of DNA evidence—maintain that even if the potential error rate for the AFTE methodology is around 1–2%, such an error rate is too high to be reliable.  (ECF No. 476 at 7 (citing Shipp, 422 F. Supp. 3d at 778).)  Again, the Court is not persuaded.  "[E]ven accepting the [2009 PCAST Report's] assertion that the error rate could be as high as 1 in 46, or close to 2.2%, such an error rate is not impermissibly high."[7] Johnson, 2019 WL 1130258, at *19.

Defendants also argue that because Fox was unable to quantify his own error rate (or the error rate of his laboratory), his testimony should have been excluded.  Defendants insist that a toolmark examiner such as Fox who applies the AFTE theory cannot clear the Daubert hurdle unless the examiner's own personal error rate also has been quantified.  The Court is not persuaded by this argument.

---

[7] Defendants also requested that the Court require Fox to state on direct examination (or, alternatively, that the Court instruct the jury) that "PCAST/Baldwin false positive rate" was "approximately 1 in 66 (upper bound 1 in 46.)."  (ECF No. ECF No. 476 at 18.)  The Court declined to mandate such testimony on direct or to provide this requested instruction.  Various studies have calculated potential error rates for toolmark analysis.  The Court finds that toolmark analysis is sufficiently reliable under Daubert and declined to mandate that the jury be told about the false positive rate from a particular report or study.  The opinions given by Fox and Ziegler used permissible language and Defendants had the opportunity to present the error rates calculated in specific studies to the jury through cross-examination or through their own witnesses.

As explained above, studies have calculated a permissible potential error for the AFTE methodology and the Court finds that this methodology is sufficiently reliable under Daubert to permit Fox's proffered identifications and opinions. The Court also finds that Fox's testimony is sufficiently reliable even though his own personal error rate has not been quantified in the manner preferred by Defendants.

Fox takes annual proficiency tests administered by Collaborative Testing Services ("CTS") and testified that he has passed all those proficiency tests. (Tr. 5002.) To his knowledge, the other examiners at the Nassau County lab had, similarly, also passed their proficiency tests. (Tr. 5059.) The Nassau County lab where Fox currently works is also accredited by multiple accrediting agencies. (Tr. 4999–5000.)

Defendants assert that this is insufficient because Fox could not provide more granular details about these assessments and his laboratory does not produce or rely on any data concerning error rates other than those proficiency tests. Defendants also contend that these proficiency tests are flawed because the tests only indicate whether the subject passed or failed and do not quantify the number of errors the subject made or indicate whether a subject can pass the proficiency test even if they make multiple errors. (See Tr. 5022; but see Tr. 5024 (Fox's testimony that if he gave one incorrect answer, he would fail the test).)

These are not sufficient reasons to preclude or limit Fox's testimony under Daubert.

Defendants also point to issues surrounding a proficiency test given by CTS in 2023 as undermining the reliability of both AFTE theory in general and Fox in particular. In 2023, CTS administered a new proficiency test, designated as Test 23-5262. According to a December 3, 2024 letter from CTS, "one common piece of feedback regarding proficiency testing as a whole is that tests are not challenging enough to truly judge the ability of the participants." (AC40 at 1.) CTS designed Test 23-5262 "with this feedback in mind to provide a case-like scenario." (Id.)

13

However, the results showed that the test was more challenging than intended and that, as a result of feedback about the test, CTS "implement[ed] additional quality control measures. . . to improve future tests."  (Id.)

First, Defendants argue that these statements from CTS undermine the validity of all the CTS proficiency tests taken by Fox and other examiners and also, more broadly, undermine the reliability of the AFTE theory.  Given the numerous studies cited by the Government showing that toolmark analysis has an error rate of approximately 1% or lower, the Court is not persuaded that Test 23-5262 and CTS's statements about that test render toolmark analysis unreliable.

Second, Defendants' post-hearing brief asserts that Fox gave an incorrect response to Test 23-5262 and that only a small number of participants made this error.  (ECF No. 476 at 16–17.) This argument is flawed on multiple grounds and does not render Fox's testimony unreliable.[8]

The Court notes that Defendants' arguments concerning Fox's personal error rate and his allegedly incorrect response on one test appear more relevant to the question of whether Fox's opinion "reflects a reliable application of the principles and methods to the facts of the case" than to whether the AFTE methodology is broadly reliable.[9]

As to that factor, the Court notes that Fox performed numerous comparisons in connection with this case and Defendants have not offered any evidence critiquing his application of the AFTE

---

[8] Defendants have not established that Fox actually gave an incorrect response on this test.  Defendants' post-hearing brief provides no supporting citation for this claim.  In an email submitted to the Court after the hearing, Defendants stated that an additional exhibit, AC42 (which was attached to that email) "is referenced in the memorandum but has not yet been entered into evidence."  The Court, however, declines to consider an exhibit that Defendants did not introduce at the hearing, particularly when they have not offered any compelling explanation for failing to introduce it and did not question Fox about this document at the hearing.  Additionally, Defendants' belated email submission never attempts to explain how and where this 90-page document indicates that Fox actually gave an incorrect answer on this assessment.  It is also notable that, when Fox subsequently testified before the jury at trial, Defendants never raised this issue on cross-examination or sought to introduce any evidence concerning Fox's allegedly incorrect answer on Test 23-5262.  Finally, even assuming arguendo that Fox did give an incorrect response on this single assessment, that would not render Fox's testimony unreliable under Daubert.

[9] Defendants point to one study which found 20 out of the 22 false positive identifications in the study were made by a small percentage of the examiners studied (5 out of 218 total examiners).  (ECF No. 476 at 7.)  As such, Defendants contend that the Court cannot find that Fox's testimony is reliable without knowing if Fox is part of the "error-prone minority."  (Id.)

14

methodology in any of these analyses. Rather, Defendants broadly attack the AFTE methodology itself. If Defendants believed that Fox is a substandard practitioner of the AFTE methodology, the defense could have critiqued his specific analyses and opinions through cross-examination or could have called a competing firearms examiner to review the same evidence and offer their own conclusions.

E. **Defendants' Criticisms of the "Sufficient Agreement" Standard**

Defendants criticize the "sufficient agreement" standard as subjective and circular. While this standard is admittedly subjective, the Court finds—in agreement with numerous other courts— that toolmark analysis is still sufficiently reliable under <u>Daubert</u> to allow Fox to provide his expert opinion about the identifications he made. See <u>Johnson</u>, 2019 WL 1130258, at *18; <u>Romero-Lobato</u>, 379 F. Supp. 3d at 112–22.

The Court notes that, in <u>Graham</u>, the court found that due to the subjective nature of the "sufficient agreement" standard, the <u>Daubert</u> factor concerning "the existence and maintenance of standards controlling the technique's operation" weighed against admissibility. <u>Graham</u>, 2024 WL 688256, at *10. Nevertheless, the court in <u>Graham</u> still ultimately permitted the testimony at issue with modest limitations that have also been satisfied here.

In one respect, <u>Graham</u> is factually distinct from both the instant case and from <u>Johnson</u>, 2019 WL 1130258, at *18. At the <u>Daubert</u> hearing before this Court, Fox explained that although the "sufficient agreement" standard does not require that an examiner find a specific "minimum mandatory threshold" number of matching characteristics to make an identification, there is also a more objective measure in firearms analysis known as "CMS," which refers to Quantitatively Consecutively Matching Striae. (Tr. 5045.) Fox is also trained in CMS and uses the CMS measure as a tool to help him determine if the sufficient agreement standard has been met. (Tr. 5045, 5049.) Under the CMS measure, examiners look, on three-dimensional objects, for "one area of eight

consecutively matching areas of striations or two areas of five" and "on two-dimensional areas," for "one area of six" matching striations or "two areas of three."  (Tr. 5045.)  Although Fox is not required to document how many striations he found were matching, the CMS standard is the "the minimum" that he uses for making an identification.  (Tr. 5046.)

In Johnson, Judge Gardaphe highlighted Fox's use of the more objective CMS methodology as a "floor" for determining any match and indicated that the CMS standard helped provide standards for Fox's findings.  Johnson, 2019 WL 1130258, at *18.  Similarly, in Romero-Lobato, the court also found that an examiner's use of CMS in his analysis weighed in favor of admissibility.  See Romero-Lobato, 379 F. Supp. 3d at 1122 (finding, in case where examiner used CMS as "additional support" for his "final conclusion," that although the use of the CMS method did not "transform the subjective factor in the AFTE method to an objective one," the "CMS method does, however, offer some objective validation to the AFTE Method").  By contrast, Graham did not discuss the CMS methodology and there is no indication that the examiner in Graham used CMS in any fashion.

Here, Fox's use of the CMS methodology further establishes the reliability of his opinions.  Moreover, even if the Court were to ignore Fox's use of the CMS methodology and fully adopt Graham's analysis of the "sufficient controlling standard" factor, the Court would still have permitted Fox's testimony.

## F.  People v. Ross

Defendants rely heavily on People v. Ross, where a New York state trial court, applying the more liberal Frye standard, substantially limited evidence concerning toolmark analysis. People v. Ross, 68 Misc.3d 899, 129 N.Y.S.3d 629, 2020 N.Y. Slip Op. 20153 (N.Y. Sup. Ct., Bronx Cnty. June 30, 2020).  This Court is not persuaded by Ross, which, inter alia, predates both the 2020 Smith Study and the 2022 Ames II Study.  It is also notable that in Ross, the defense

called two expert witnesses who "were qualified as experts in the related fields of scientific research methodology and study design" and the court called, as court-appointed expert, another witness with a doctorate in statistics. <u>Ross</u>, 68 Misc.3d at 907–11. No such experts were called by the defense in this case.

While Defendants stress the fact that Fox testified at the hearing in <u>Ross</u>, Fox was not the examiner who conducted the analyses at issue in <u>Ross</u>. (Tr. 5053.) Rather, Fox testified generally in <u>Ross</u> about the AFTE methodology and toolmark analysis. Thus, while the court in <u>Ross</u> substantially limited the proffered toolmark analysis evidence at issue, the court in <u>Ross</u> did not consider or critique any specific analysis conducted by Fox or Fox's proficiency as a firearms examiner. The <u>Ross</u> court instead grounded its decision on a broader critique of the AFTE theory and the "substantial agreement" standard. This Court, however, is not persuaded by that critique or the critiques of other courts that substantially limited the testimony of firearms examiners under the <u>Daubert</u> standard. Those criticisms do not render the AFTE methodology or Fox's specific testimony unreliable under <u>Daubert</u> or warrant the severe limitations imposed in <u>Ross</u>, which precluded the examiner from opining on the "significance of any marks other than class characteristics." <u>Ross</u>, 68 Misc.3d at 918.

## G. <u>Subclass Characteristics</u>

Defendants, citing <u>Ross</u>'s discussion of subclass characteristics, also assert that the issues concerning potential subclass characteristics undermine the reliability of toolmark analysis, which requires examiners to identify individual characteristics and to use those individual characteristics to match ballistics evidence to a specific firearm. <u>See Ross</u>, 68 Misc.3d at 902–03, 917.

Class characteristics are design features that would be expected to be consistent across all guns that are the same make and model. (Tr. 2465.) By contrast, subclass characteristics are unintentional and "not determined by the manufacturer," and such marks "could be left on a

smaller sample size" of a firearm.  (Tr. 5052.)  For example, Fox explained that, "during the manufacturing process, the tool that's being used could get a chip in the tool somehow and those marks could be left on a smaller sample size."  (Id.)  Fox testified that subclass characteristics are "usually gross marks that are easily identifiable.  (Tr. 5052–53.)

The court in Ross found subclass characteristics to be a "significant flaw" in toolmark analysis because, according to the court, the "literature and the forensic science expert [who testified in Ross] confirmed that subclass characteristics remain an unknown for the examiner under ordinary circumstances" and an examiner could "mist[ake] a subclass characteristic for an individual one."[10]  Ross, 68 Misc.3d at 917.

The Court is not persuaded by Defendants' arguments concerning potential subclass characteristics.  In Johnson, Judge Gardaphe, citing United States v. Monteiro, 407 F. Supp. 2d 351 (D. Mass. 2006), noted the criticism that "that no standards exist 'for deciding whether a particular mark is a subclass or individual characteristic.'"  Johnson, 2019 WL 1130258, at *12 (quoting Monteiro, 407 F. Supp. 2d at 369–71).  Judge Gardaphe, however, still found that Fox's testimony satisfied Rule 702.  This Court agrees.[11]  Additionally, Justice Gould's dissenting opinion in Abruquah grappled with the issue of subclass characteristics and two relevant studies, concluding that, "from these studies, the trial court could have reasonably concluded that, despite the risk of subclass carryover, the AFTE Theory is sufficiently reliable to admit" the expert

---

[10]  At the Daubert hearing, Fox testified that he had a written an article on subclass characteristics on ammunition.  (Tr. 5052.)  Defendants never introduced this article into evidence or questioned Fox about the substance of this article.  In their briefing, Defendants cite this article for the proposition that subclass characteristics can be mistaken for individual characteristics.

[11]  Although there is no AFTE standard for identifying subclass characteristics, as noted above, Fox testified that subclass characteristics are usually "gross mark[s] that are easily identifiable." (Tr. 5053.)

witness's testimony.[12]  <u>Abruquah</u>, 483 Md. at 752 (Gould, J, dissenting).  For the 2022 Ames II Study, Justice Gould explained, <u>inter alia</u>, that "even though examiners may have reported false positives more frequently for certain categories of guns, that the highest false positive rate was just 1.14 percent paints a picture of a reliable discipline."  <u>Id.</u>  This Court agrees with that analysis and finds that the AFTE theory is sufficiently reliable.  Notably, the 2022 Ames II Study took steps to address the issue of potential subclass characteristics by using "consecutively or sequentially manufactured barrels and slides."  (2022 Ames II Study at 94.)

Defendants also contend that Fox's notes for CL21-0099/3 highlight the problems of subclass characteristics.  For CL21-0099/3, Fox identified that potential subclass characteristics were present after examination and casting the barrel for this Ruger firearm, and those findings contributed to his ultimate determination that the bullet comparisons he conducted were inconclusive.  (Tr. 5064–66.)  That determination and explanation, however, does not show that the AFTE methodology is broadly unreliable.  Fox's examination and analysis in CL21-0099/1 indicate that he is a cautious and meticulous examiner.  Moreover, as explained above, studies indicate that, despite the possibility of potential subclass characteristics, the AFTE methodology is still sufficiently reliable.[13]

## H.  **Fox's Analysis and Testimony Concerning Glock Firearms**

Defendants assert that Fox's analysis in CL25-2139 of test-fired bullets from a Glock Model 17 pistol shows that the AFTE methodology is unreliable.  Again, the Court disagrees.  Fox explained that the specific manufacturing process ("hammer forging") that Glock previously used

---

[12]  The Government provided the Court with one of these studies, the 2022 Ames II Study.  The other study cited by Justice Gould was James E. Hamby, et al., *A Worldwide Study of Bullets Fired From 10 Consecutively Rifled 9MM RUGER Pistol Barrels – Analysis of Examiner Error Rate*, 64 J. Forensic Scis. 551 (Mar. 2019).

[13]  Although the potential subclass characteristics Fox identified for the Ruger firearm in CL21-0099/3 involved the barrel and, thus, could affect the bullet comparisons at issue, Fox was still able to match the recovered cartridge casings to this Ruger firearm.  (Tr. 6233.)

to produce barrels did not leave individual characteristics or made individual characteristics hard to identify. (Tr. 5053–56.) As such, this specific manufacturing process makes it harder to identify bullets fired from those barrels. (Tr. 5055–56.) Fox, however, persuasively explained that this manufacturing issue concerning Glock barrels only impacts bullets and did not affect his analysis of cartridge cases linked to this Glock firearm. (Tr. 5055–56.) Contrary to Defendants' contentions, this testimony does not broadly undermine the AFTE methodology or render Fox's identifications of these cartridge casings unreliable. The fact that certain firearms from one manufacturer were manufactured in a manner that makes inconclusive determination involving bullets more likely does not broadly discredit the AFTE methodology or render that methodology unreliable when applied as to other firearms.

## I. Contextual Bias

Defendants also assert that Fox's analyses are not reliable because they were subject to heightened contextual bias. Defendants claim that the record shows that this alleged contextual bias influenced Fox's analyses. Relatedly, Defendants also point to studies concerning contextual bias in firearms analysis, which Defendants maintain is a concern given the subjective nature of the AFTE methodology.

Defendants stress the fact that across two lab reports (CL21-0099 and CL25-2139), Fox found "inconclusive" or "elimination" results for each bullet he compared, but was able to make identifications for every cartridge casing. (ECF No. 476 at 9.) Defendants hypothesize that this occurred because Fox had "NIBIN" leads for all the cartridge cases, but no such leads for the bullets.[14] However, as explained earlier in the discussion above concerning the Ruger and Glock

---

[14] For the NIBIN system, images of cartridge casings are entered into a federally-managed database and are correlated against other images of cartridges in the database to create computer-generated leads. (Tr. 4997–98, 6168, 6283.)

firearms at issue in CL21-0099 and CL25-2139, Fox provided persuasive and specific explanations why, for these bullet comparisons, he made inconclusive determinations.[15]

Defendants contend that the conclusions of Fox and his reviewing examiner were also influenced by other information, including communications with the prosecution team. These criticisms were appropriate grounds for cross-examination, but do not show that the AFTE methodology or Fox's specific testimony is unreliable under Daubert.

If Defendants believed that potential contextual bias from the NIBIN leads or other information affected Fox's analyses, Defendants could have proffered a competing firearms examiner who examined the evidence at issue without the contextual information known to Fox (and his reviewer Krupp) that Defendants contend infected their analyses. No such witness was called and, as noted earlier, the defense never established through cross-examination or the introduction of additional evidence that Fox's numerous analyses and conclusions concerning the evidence related to this case misapplied the AFTE methodology or that other firearms examiners would have reached different conclusions for any of the specific ballistics evidence at issue.

With respect to the issue of contextual basis, the Court also previously addressed some of Defendants' criticisms in the Court's February 18 order concerning Ziegler. In that order, the Court addressed one study cited by Defendants: Mattijssen, Erwin, et al., *Cognitive Biases in the Peer Review of Bullet and Cartridge Case Comparison Casework: A Field Study*, Science & Justice, 6, 4 (2020) (hereinafter, the "Cognitive Biases Study"). For the reasons set forth in that order, while this study "might provide fodder for cross-examination concerning contextual bias," it does not render Fox's identifications unreliable. (ECF No. 446.)

---

[15] Defendants requested that the Fox be required to disclose, on direct examination, his knowledge of these NIBIN leads. The Court did not grant that request. Defendants possessed information about these NIBIN leads and used that information on cross-examination.

## J. Fox's Qualification and Alleged Errors

Defendants' critique of Fox's education and training is meritless.  (See ECF No. 476 at 15.)

Finally, Defendants point to one report where the reviewing examiner flagged certain errors and mistakes.  Defendants contend that this is evidence of a pattern of carelessness that undermines the reliability of Fox's conclusions and is particularly probative given the subjective nature of firearms analysis.  The Court is not persuaded.  During the review process for one report (out of more than thirty that Fox prepared in connection with this case), certain issues and questions were raised by the reviewer, which were then addressed.  (Tr. 5066–71.)  These facts—which help show that the review process is not a rubber stamp—actually buttress the reliability of Fox's opinions.

### III.  CONCLUSION

For the reasons stated above, the Court denied Defendants' requests to preclude or limit the testimony of Fox and Ziegler.  The testimony and opinions they were permitted to provide at trial satisfied the Daubert standard for admissibility.

**SO ORDERED.**

Dated:  June 8, 2026
Central Islip, New York

_____/s/   (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE

22